# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 03, 2013

## STATE OF TENNESSEE v. DONALD PRESCOTT

**Appeal from the Criminal Court for Shelby County**
**No. 1000018     James M. Lammey, Judge**

**No. W2012-02454-CCA-R3-CD  - Filed April 11, 2014**

Following a jury trial, Defendant, Donald Prescott, was found guilty of especially aggravated robbery. He was sentenced to serve thirty years' incarceration. In this appeal as of right, Defendant presents two issues for review. He asserts that (1) the trial court erred by denying his motion to suppress the victim's pre-trial and trial identifications of Defendant; and (2) the evidence was insufficient to support his conviction for especially aggravated robbery because the State failed to present sufficient evidence to prove beyond a reasonable doubt that the victim suffered serious bodily injury. After a thorough review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JEFFREY S. BIVINS, J., concurs in result.

Steven Bush, District Public Defender; Tony N. Brayton, Assistant Public Defender; Nicholas Cloud, Assistant Public Defender; and Kathy Kent, Assistant Public Defender; Memphis, Tennessee, for the appellant, Donald Prescott.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Michael McCusker, Assistant District Attorney General; Melanie Headley, Assistant District Attorney General; and Jessica Banti, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

*Pre-Trial Suppression Hearing*

The victim, David Chinn, was 47 years old on August 18, 2009, when he left work at FedEx in Memphis at 5:30 a.m. to go home to his apartment on Winchester Road in Memphis. After he entered the breeze way between two apartment buildings at approximately 5:50 a.m., one assailant grabbed his arm. Mr. Chinn pushed the man away and was then struck on the head with a baseball bat used by a second male assailant. Mr. Chinn never got a thorough look at the second assailant and was consequently never able to identify him. However, he knew that both assailants were black males. Mr. Chinn was able to focus on the first assailant who was up close to him and who ordered Mr. Chinn to get on the ground and give the men money. Mr. Chinn identified Defendant as the first assailant. Defendant eventually took the baseball bat from his accomplice and also struck Mr. Chinn. In all Mr. Chinn was struck multiple times in his head resulting in 45 stitches to sew up the multiple wounds. Ultimately Mr. Chinn threw his wallet containing $50.00 on the ground, Defendant and his accomplice ran away, and Mr. Chinn sought help.

During his direct examination Mr. Chinn testified as follows regarding his identification of Defendant.

> Q. Okay. How close was the person who was grabbing your arm?
>
> A. Right - just right up on you.
>
> Q. Okay. What were the lighting conditions like at that time?
>
> A. Good enough to see.
>
> Q. Good enough to see? - did you recognize the person that attacked you? - had you seen him before? - did you know him?
>
> A. I didn't see him before, but I recognize him, you know, now.
>
> Q. Okay. Do you see that person in the courtroom today?
>
> A. Yes, I do.

Q.        And where is he sitting? - what is he wearing?

A.        He's wearing blue and like a white T-shirt sitting right there on the left - my left.

Q.        And do you know that individual to be Donald Prescott [Defendant]?

A.        I do now.

Q.        Okay.

[Prosecutor]:        Your Honor, let the record reflect he's identified Mr. Prescott [Defendant].

THE COURT:        All right.

Mr. Chinn could not get assistance from anyone in the apartment complex. He was bleeding badly from numerous wounds to his head. He eventually laid down on the ground and called 9-1-1 for help. He was transported to the trauma center in Memphis known as "The Med." While there, a Memphis police officer interviewed Mr. Chinn for a few minutes and got a description of the perpetrator later identified by Mr. Chinn as Defendant. The limited description given by Mr. Chinn was of a black male, between 5 feet, 10 inches and 6 feet tall, with a hair style identified by Mr. Chinn as having "short twists." In his testimony at the suppression hearing, Mr. Chinn clarified that "short twists" meant approximately one inch in length.

The proof at the suppression hearing revealed that Mr. Chinn went to the police station the day after the incident to retrieve his eyeglasses which had been knocked off during the robbery. While there, he was shown a photospread of six black males. Defendant's picture was not included in the photospread. Mr. Chinn did not make an identification from the photospread. The day after that trip to the police department, Mr. Chinn returned to see the police officer who was in charge of the investigation in order to give a written victim's statement. This officer was Sergeant Fair. Because Mr. Chinn had possibly still been on medications the day before when he looked at the photospread, Sergeant Fair decided to show the same one again to Mr. Chinn. The victim still did not identify anyone from the first photospread.

A few days later a "crime stopper's" tip led to Defendant being developed as a suspect. Another entirely different photospread of six black males, including Defendant, was shown to Mr. Chinn on September 2, 2009. Based upon the testimony of both Mr. Chinn and

Sergeant Fair, Mr. Chinn identified Defendant as the first assailant. Mr. Chinn did not hesitate in his identification, and he was confident in his identification.

As pertinent to the precise issue raised by Defendant, Sergeant Fair testified that the composite of black males to submit with Defendant's picture in the photospread was determined from examples provided by the police department's database. He testified that he included various similar characteristics of the description of the first assailant. Specifically, Sergeant Fair testified that he put in the height, weight, build, and complexion, in addition to "hair characteristics." Sergeant Fair testified that each photograph had the "dread hairstyle" but notably did not state that he limited his database search to black males with a "short twists" dreadlock hairstyle.

During cross-examination, Mr. Chinn was asked to carefully review the photospread from which he identified Defendant as "the guy that beat me with a baseball bat and [r]obbed me of [my] wallet." Defendant's picture in the photospread was in "slot 5." Mr. Chinn's testimony on this matter was,

> Q. Mr. Chin, I want you to look at that photo lineup. That's the one where you identified [Defendant], correct?
>
> A. That's correct.
>
> Q. I want you to look at the person in Slot 1. His hair comes down near his shoulders, doesn't it?
>
> A. Yes, it does.
>
> Q. The person in Slot 2, his hair also comes down to his shoulders, doesn't it?
>
> A. That's correct.
>
> Q. The person in Slot 3, his hair is also approaching his shoulders, isn't it?
>
> (There was a pause in the proceedings).
>
> A. It's close.
>
> Q. At a minimum, it's significantly past his ears, is it not?

A. Yes.

Q. The person in Slot 4, his hair is on his shoulders in that picture, isn't it?

A. That's correct.

Q. Let's jump over to Slot 6. His hair is not quite on his shoulders, but it's significantly past his ears as well, isn't it?

(There was a pause in the proceedings).

A. It's - kind of.

Q. And in Slot 5 is [Defendant], he has short twists, doesn't he?

A. That's correct.

Q. His hair is significantly above his ears, isn't it?

(There was a pause in the proceedings).

A. That's correct.

*Trial Proof*

Before setting forth a summary of the facts presented at trial, we first note that when a defendant challenges on appeal the sufficiency of the evidence to support his conviction, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). Also, when a trial court's decision on a suppression motion is reviewed on appeal, the prevailing party, in this case the State, "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." *State v. Odom*, 928 S.W.2d 18, 22-23 (Tenn. 1996). Evidence presented at the trial as well as evidence submitted at the suppression hearing may be considered by the appellate court when deciding the correctness of a trial court's ruling on a suppression motion. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

In his argument regarding the suppression issue, Defendant's sole ground for relief is that the photospread was unduly suggestive "because hair style was an important part of

the [victim's] description and the [Defendant's] hair style resembled the [victim's] description but did not resemble the hair style of other participants in the lineup." Basically, Defendant asserts that his picture was the only one of six where the person had short hair, i.e., "short twists." As to his issue regarding the sufficiency of the evidence, Defendant's sole argument is that the State failed to prove the necessary element that Mr. Chinn suffered serious bodily injury. Keeping in mind the legal principles set forth above and the precise narrow issues presented by Defendant, we will summarize the relevant testimony at trial.

Mr. Chinn's trial testimony regarding the details of the especially aggravated robbery mostly mirrored his testimony at the suppression hearing. As to the injuries he received as a result of the especially aggravated robbery, Mr. Chinn provided some additional facts and clarifications. He admitted that he never lost consciousness and that his skull was not cracked. However, his dominant left hand was permanently damaged and he remained unable to make a fist with his left hand after the incident. He showed the scars on his head to the jury, but the State failed to elicit any specific testimony for the record concerning what was shown. Nevertheless, photographs taken of Mr. Chinn shortly after the incident and admitted as exhibits show very noticeable scarring of his head where the baseball bat struck him. He could not go to work for at least two months after the incident due in part to dizziness, which he still suffered from to an extent at the time of the trial. One additional fact testified to at trial regarding Mr. Chinn's observations of Defendant during the incident was that at one point Mr. Chinn was able to momentarily get away from the assailants and run from inside the breeze way to outside of the buildings. Here the improving daylight and a streetlight enabled Mr. Chinn to view Defendant who was four to five feet away, holding the bat to prevent the victim's total escape. Mr. Chinn was able to get a look at Defendant's face.

During cross-examination Mr. Chinn was reminded that he had also "almost bled out" from the wounds. Mr. Chinn testified that when the wounds on his head healed, the scars "didn't just go down." The transcript shows that Mr. Chinn next said the wounds "left an indignation [sic] on my head." We do not know if Mr. Chinn used an incorrect word for what he meant, or if he actually used another word and the court reporter made a typing mistake. From our review of the photographs admitted in evidence and other statements in the proof, it appears the jury could see that scar tissue is raised above the surrounding skin and is therefore quite noticeable.

Nichols Kolesar, a paramedic with the Memphis Fire Department, responded to the crime scene. When he arrived, Mr. Chinn was lying on his side in the parking lot in a pool of blood. Mr. Chinn was alert and oriented as to person, place, time, and self. The wounds from which he had been bleeding had "clotted off" and therefore the bleeding had stopped. Mr. Chinn had had significant blood loss, estimated to be approximately one-half liter. Mr. Kolesar testified that he started an IV into Mr. Chinn through a needle inserted into the

victim's left hand. He added that he would not have used the left hand for this if he had had any indication of an injury in that hand. Mr. Chinn denied pain anywhere other than his head. The State also presented two other witnesses whose testimony was not relevant to the issues on appeal.

Defendant did not testify, but he presented the expert testimony of Dr. Jeffrey Nevschatz. Dr. Nevschatz testified in the field of eyewitness identification, specifically "to educate the jury on issues related to eyewitness identification - lineup identification - factors that can help or hinder memory or identification." As pertinent to Defendant's issue regarding the photospread, Dr. Nevschatz testified,

> Q. Okay. What is the impact - first of all, what is the best way to select members of a photo lineup?
>
> A. So the suspect in the lineup should not stand out based on the description given by the witness. So, if the witness has said that the person has red hair, then everyone in the lineup should have red hair. It would be a bad lineup if only the suspect was the person in the lineup that had red hair because that person would stand out and would be picked at a rate greater than one in six or one in whatever number of other people in the lineup are.
>
> Q. What is the impact of that not being followed?
>
> A. That people are going to be chosen more often, and it can lead to more false identifications.
>
> Q. So, if [Defendant] was described as having short twists as a hairstyle, should the other pictures have short twists?
>
> A. Yes.
>
> Q. Why should they have short twists?
>
> A. Because if he is described that way, he shouldn't stick out based on the description.
>
> Q. If he is the only one in the photo lineup with short twists, is that bad?
>
> A. In my opinion, that would be a very biased lineup.

Q.      Does it make identification unreliable?

A.      In my opinion.

Andrew Kjellin, a Memphis Police Department officer assigned to the "felony response" team arrived at the scene between 7:00 a.m. and 7:15 a.m. on the morning of the incident. He had check records and verified that official sunrise on August 18, 2009 was at 6:22 a.m. He also confirmed that there is some daylight prior to official sunrise. Officer Kjellin also noticed several streetlights were located around the edge of the apartments.

**Analysis**

*Sufficiency of the Evidence*

A guilty verdict by a jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict creates a presumption of a Defendant's guilt, and the burden is on the defendant to illustrate why the evidence is insufficient to support the jury's verdict. *Id.* The standard of review is whether "after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000) (quoting *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and an appellate court should not re-weigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *Bland*, 958 S.W.2d at 659. As noted above, the State is entitled to the strongest legitimate view of the evidence and to all legitimate inferences that may be drawn therefrom. *Smith*, 24 S.W.3d at 279.

Especially aggravated robbery, Defendant's conviction offense, is defined as follows: robbery as defined in Tennessee Code Annotated section 39-13-401, where the robbery is accomplished with a deadly weapon *and* the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403. Robbery is defined in Tennessee Code Annotated section 39-13-401 as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Defendant does not challenge the sufficiency of the evidence to support proof beyond a reasonable doubt that there was theft of property from Mr. Chinn by violence or placing Mr. Chinn in fear, and that it was accomplished with a deadly weapon (the baseball bat). Defendant strongly argues that the proof failed to show that Mr. Chinn suffered "serious bodily injury."

"Bodily injury" includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(2). "Serious bodily injury" is defined as "bodily injury" that involves:

(A)     A substantial risk of death;

(B)     Protracted unconsciousness;

(C)     Extreme physical pain;

(D)     Protracted or obvious disfigurement;

(E)     Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F)     A broken bone of a child who is eight (8) years of age or less;

Tenn. Code Ann. § 39-11-106(34).

Defendant argues that none of the factors (A) through (F) exist in this case. The State argues that it proved "a substantial risk of death" to Mr. Chinn, "protracted or obvious disfigurement," and "protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty."

As to factor (A), "a substantial risk of death," we are bound by precedent in our supreme court's decision in *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012). In that case the court held,

> By the plain meaning of this language [an *injury* that involves a substantial risk of death], we hold that in determining whether there was a "serious bodily injury" based on a "substantial risk of death," we must look to the injury that occurred rather than the injury that *could* have occurred or the manner in which it occurred.

*Id*. at 102.

In *Farmer*, our supreme court held that under this standard the victim did not suffer a serious bodily injury as a result of a substantial risk of death when he was shot in the leg by the defendant's use of a handgun, and the bullet passed through the leg without causing a loss of consciousness, extreme pain, disfigurement, or impairment to the victim. The bullet

wound also required minimal medical treatment. Relying upon *State v. Page*, 81 S.W.3d 781, 784 (Tenn. Crim. App. 2002), the State argues that "[i]t is common knowledge that repeated blows to the head with a hard, blunt object like a baseball bat can kill." This argument, however, flies in the face of the ruling in *Farmer*: unless the actual bodily injury to the victim is shown by evidence to have caused a substantial risk of death to the victim, this factor cannot be used to establish "serious bodily injury." There was no expert testimony or other medical evidence that Mr. Chinn faced a substantial risk of death from the actual injuries he received. According to our supreme court in *Farmer*, it does not matter that one more blow to the head might have caused sudden death to Mr. Chinn. What matters is what did occur, not what *could* have occurred if a bullet passed through one inch to the right, a knife wound *could* have severed an artery one millimeter to the left, or what the seventh crack at a skull by a wooden baseball bat *could* have done. However, we conclude that the injury to Mr. Chinn's hand, caused a "protracted *loss* or *substantial* impairment of a function of bodily member" as urged by the State. He testified that he could not close it fully into a fist, and that made use of his left hand difficult at work. His testimony clearly showed substantial impairment of the function of his left hand.

We also conclude that the evidence was sufficient to prove beyond a reasonable doubt that the scars on Mr. Chinn's head caused "protracted or obvious disfigurement" and thus caused serious bodily injury. Defendant argues that since the scars are located on the victim's head where he has hair and cannot be readily seen by the eye and are not easily found, they are not "obvious" disfigurements. We do not feel the legislature intended to so limit the definition of "obvious" disfigurement. Otherwise, the most graphic scarring or other physical damage to the parts of a human body always covered in public by clothing within the bounds of common decency could never considered "serious bodily injury" because they would not be readily seen by the eye. In any event, the definition is "protracted" *or* "obvious" disfigurement. We have carefully reviewed the scarring shown in the photographs and reviewed Mr. Chinn's testimony in the light most favorable to the State. The multiple scars which are on the victim's head are both protracted and obvious disfigurement. Accordingly, the evidence is sufficient to support the conviction for especially aggravated robbery. Defendant is not entitled to relief on this issue.

*Suppression of Photospread and Subsequent Identifications of Defendant*

As stated above, Defendant argues that the photospread from which Mr. Chinn identified Defendant as a perpetrator is unduly suggestive. In *Simmons v. United States*, 390 U.S. 377, 384 (1968), the Supreme Court held,

> each case must be considered on its own facts, and that convictions based
> on eye-witness identification at trial following a pretrial identification by
> photograph will be set aside on that ground only if the photographic

identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id*. (Emphasis added).

Noting that it is "the likelihood of misidentification which violates a defendant's [constitutional] right to due process," *Neil v. Biggers*, 409 U.S. 188, 198 (1972), the Court in *Biggers* has also noted again that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Id*. (quoting *Simmons*, 390 U.S. at 384). However, even if the photospread is suggestive, the Court in *Biggers* held that the evidence of the pre-trial and trial identifications may still be admissible if, under the totality of the circumstances, the identification is still reliable. *Id*. at 200. The Court set forth five factors to be considered when a court evaluates the likelihood of misidentification as a result of a suggestive pre-trial
identification: These are:

(1)     the opportunity of the witness to view the criminal at the time of the crime;

(2)     the witness's degree of attention;

(3)     the accuracy of the witness's prior description of the criminal;

(4)     the level of certainty demonstrated by the witness at the confrontation; and

(5)     the length of time between the crime and confrontation.

*Id*.

The trial court's entire ruling on the motion to suppress pre-trial and trial court identification is as follows:

THE COURT:     Well, I'm looking at this photospread. I've looked at the - I don't think it's unduly suggestive at all. In fact, the victim had to look very, very close at the photos to see even what length they were. You can clearly see the Jheri curls on top of No. 5, which is his client. And from the views that we see - this is a frontal view. I suppose if they gave a back view to see if the length of the Jheri curls, No. 6 looks to be fairly short. No.

-11-

3 looks to be fairly short. You know, and the face - the facial structures all seem very similar. I don't think this is unduly suggestive at all. I really don't.

So, I guess I'll note your exception, but the victim was quite adamant that this was him. He was certain of it according to his testimony; and his reaction, as testified by the officer, Detective Fair, was that he was certain.

You know, in situations like this, there's six photographs of similar individuals with facial structure that seem all to be pretty similar; and I think that's a small nuance that when you're looking facial structure of somebody and whether or not they can recognize someone. That's - the jury - I think that would be a jury question. I think it's not unduly suggestive, so I'm not going to suppress the identification in this case.

He did testify that he based his identification on what he had seen at the time; so, based upon all of that, I'm going to show that request denied. Are we getting a trial date?

The actual photospread used by Mr. Chinn to identify Defendant on September 2, 2009, fifteen days after the incident, was made an exhibit and is properly in the record. The pictures of all six African-American men are in color and each picture is a frontal view of the face from where the neck meets the shoulder, upward to the top of the head. The background in each picture is light enough to enable any viewer to clearly see the length of the dreadlocks on each subject. In this record, the only description of the perpetrator that Mr. Chinn gave prior to viewing the photospread was that of an African-American male, 5 feet, 10 inches to 6 feet tall, with his hair styled in "short twists" which everyone understood to be short dreadlocks.

The photographs in the photospread are contained in two rows of three photographs and take up the top two-thirds of the sheet of paper consisting of the photospread. Photograph "slots" 1 through 3 are on the top row, with "slots" 4 through 6 on the bottom row. Slot 5, the photograph of Defendant, is on the bottom row in the center and is therefore approximately in the center of the letter sized piece of paper which is the photospread. Since viewing the photospread in order to reach a conclusion of whether or not it is unduly

-12-

suggestive does not involve a credibility determination, this court is just as capable as the trial court to review the evidence and draw its own conclusions. *See State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000).

Therefore, we review de novo without any presumption of correctness the trial court's conclusion that the photospread was not unduly suggestive. With all due respect to the trial court, we conclude that the photospread in this case is unduly suggestive. Indeed, based upon the meager prior description given by Mr. Chinn, *any* person with that much information could only pick Defendant if instructed to pick the one most resembling Mr. Chinn's description. The dreadlocks in slot 1 appear to be least 4 inches long and reach shoulder length. Three of the remaining slots of subjects other than Defendant have dreadlocks that go below the top of the shoulders and appear to be 6 inches or longer. The final photograph that is not Defendant has dreadlocks that come down to within an inch of the shoulders. Defendant's "short twists" are the *only* ones that do not fall far below the bottom of the ears.

However, even though in this case the photospread is unduly suggestive, we conclude that under the five *Biggers* factors, Mr. Chinn's identifications of Defendant is still reliable. Based upon Mr. Chinn's testimony and other evidence, he had more than ample opportunity to view defendant at the time of the crime, and he was very attentive toward Defendant, he was "100%" sure of his identification of Defendant, and there was only fifteen days between the date of the crime and observation of the photospread. The fifth factor, the accuracy of Mr. Chinn's prior description of Defendant, is neutral due to the scant prior description given by Mr. Chinn, according to evidence in the record. Defendant is not entitled to relief on this issue.

Therefore, in conclusion, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-13-